## TURINI v. ALLENS MFG. CO., Inc.
### No. 4631.

United States Court of Appeals
First Circuit.

Aug. 19, 1952.

Harvey W. Mortimer, New York City (Joseph Mainelli, Providence, R. I. and Darby & Darby, New York City, on brief), for appellant.

Ralph Rotondo, Providence, R. I., for appellee.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and WYZANSKI, District Judge.

WOODBURY, Circuit Judge.

This is an appeal from a final judgment dismissing a complaint alleging the defendant's infringement of three patents issued to and owned by the plaintiff, and praying for

both a temporary and a permanent injunction against further infringement, an accounting of profits and damages, costs and a reasonable attorney's fee, and treble damages under 35 U.S.C.A. § 67 (now 35 U.S.C.A. § 284), for willful and deliberate infringement. The patents involved relate to the art of making buckles; typically the small metallic buckles commonly used on women's and children's shoes. The first, No. 2,481,179, is for a method of making buckles. The other two, Nos. 2,481,180 and 2,488,352 are for a machine and a device, respectively, for practicing the method disclosed in the patent referred to first above. The court below found all the patents invalid for lack of invention and entered its judgment in accordance with that conclusion without considering invalidity on any other ground or the issue of infringement. On this appeal the plaintiff below and appellant here contends that the District Court erred in its conclusion of invalidity and he also contends that this court should hold as an inescapable conclusion from the testimony not only that the patents were infringed, but also that the defendant's infringement was willful and deliberate so that the plaintiff is entitled to a judgment awarding him treble damages under the statute cited above.

Buckles of the type involved are familiar to everyone. They consist of at least two and usually three separate parts, a frame, a tongue and frequently a roller also. The frame has two side bars, two end bars, and a central cross bar. The tongue is attached to the central cross bar by bending one end of the tongue loosely around the cross bar so that it can be pivoted thereon for insertion in a hole in the strap. The roller is a piece of flat metal bent into cylindrical form loosely around the end bar of the buckle against which the tongue is designed to bear, its purpose being to permit easy movement of the strap through the buckle.

For years shoe and similar buckles were produced in quantity on power operated presses. A strip of the metal to be used for the frame was passed through an automatic power press provided with simple and well known piercing and cutting tools which stamped out the buckle frame. Another automatic power press fed with a strip of the metal to be used for the roller cut the strip into rectangular pieces and bent the pieces longitudinally into U-shape in cross-section. A third automatic press cut a wire into short lengths, and then bent each length into a sway-backed L-shape to form the tongue. At least one person was required to operate these three automatic presses.

Assembling the pieces was accomplished on two non-automatic or foot presses each of which required an operator. One of these presses was equipped with a bending tool for bending the shorter leg of the L-shaped tongue around the central cross bar of the buckle frame. The operator of this press placed one buckle frame and one tongue in position under the press by hand, and then kicked the foot pedal of the press to activate it and accomplish this bending operation. The other foot press was used to attach the roller. Its operator by hand placed the appropriate end bar of a buckle frame into one of the preformed U-shaped roller pieces and, positioning the parts in the press, kicked the foot pedal to activate the press which bent the U-shape into circular form to close the roller around the end bar of the frame.

The plaintiff's patents here in issue cover a method and the mechanical means for performing the above separate operations in a series of automatic operations thereby reducing labor cost and at the same time speeding production.

Turini's basic conception was to form and assemble the separate buckle parts while the frames remained joined together in the strip of material from which they were punched in such a way that the buckle could be wholly assembled before severing the buckle frames from one another, thereby eliminating the necessity of handling small parts difficult to grasp such as tongues and rollers. His patented method, therefore, is as the first step in the process of manufacture to punch out only the openings of the frames, leaving the frames joined together in the strip. And to make it possible to attach the rollers while the buckle frames remain joined to-

gether in the strip, he shows, and this is the gist of his method patent, forming the buckle frames transversely of the strip, that is to say, with the end bars of the frames at the edges of the strip, not with the side bars at the edges of the strip as had been shown before in Patent No. 1,882,369 issued to Russell on October 11, 1932. In this way rollers can be attached to the end bars along one edge of the strip, and tongues can also be attached to the central cross bars, and after this is done the completely assembled buckles can be severed from one another as the final step.

The Turini method patent, No. 2,481,-179, issued September 6, 1949, contains two claims the more inclusive of which reads:

2. "The method of manufacturing a buckle comprising the steps of stamping a continuous metallic strip with successive buckle openings having an end bar and a cross bar extending longitudinally of the strip at each buckle opening, attaching successive buckle rollers to each end bar on said strip, attaching successive buckle tongues to each cross bar on said strip, and subsequently stamping successive finished buckles from said strip."

Read in the light of the prior art, the crucial word in the claim is "longitudinally." The reason for this is, primarily, that Russell in the patent issued to him in 1932 referred to above showed stamping buckle frame openings out of a continuous metallic strip, the successive buckle openings having an end bar and a cross bar extending transversely of the strip, leaving the frames joined together in the strip while successive buckle tongues are attached to each cross bar, and as a final step severing successive buckles from the strip. Russell's method, however, does not permit attaching rollers while the buckle frames remain joined together in the strip, for the frames are joined in the strip end bar to end bar, that is with the side bars of the frames formed from the edges of the strip, whereas with Turini's arrangement of end bars and cross bars longi-

tudinally of the strip rollers can be attached to the end bars along the edges of the strip in addition to attaching tongues on the cross bars as shown by Russell. Herein, it is said, lies Turini's patentable advance over Russell. But it does not appear that Russell was interested in making buckles with rollers. For all that appears he was only interested in making the simpler form of rollerless tongued buckle rapidly and with minimum waste material.

The question, therefore, is whether a mechanic skilled in the art, aware of Russell's continuous strip method of making buckles without rollers, would hit upon the expedient of stamping the buckle frames out of the strip with their end bars, instead of transverse as in Russell, "longitudinally of the strip" so that a roller as well as a tongue could be attached to each buckle before it was severed from the strip.

The District Court answered this question in the affirmative. It found that Turini's advance over Russell was not great enough to warrant classification as an invention and we agree. It seems to us that persons skilled in the buckle art seeking to make a buckle with a roller by Russell's economical and rapid method would have little difficulty in finding that the solution of the problem lay in stamping the buckle frames across the strip so that they would lie therein side by side with their end bars at the edges of the strip where rollers could be attached to them before severance from the strip. Indeed there is testimony that others before Turini had done that very thing and this brings up a question with respect to the admissibility of that testimony which can conveniently be considered at this point.

The defendant called a witness to the stand who qualified as an expert toolmaker with years of experience as a manufacturer of buckles, and this witness not only testified that Turini's development or adaptation of Russell's continuous strip method to the production of buckles with rollers was within the skill of a buckle mechanic, but he also testified over the

plaintiff's objection that since 1939 he had known and used the method of stamping a continuous metallic strip with successive buckle frames having their end bars and cross bars running longitudinally instead of transversely of the strip. Furthermore he testified that he had known of and had practiced the method of attaching rollers to successive end bars of frames stamped out in a continuous strip as above since 1942, and he identified certain exhibits which he said illustrated the steps in the process about which he had testified.

The plaintiff-appellant maintained at the trial and maintains here that the testimony of this witness to which he objected was erroneously admitted because the defendant admittedly had failed to give the notice in writing of his intention to rely upon it which he contends is required by statute. 29 Stat. 692, as amended by 53 Stat. 1212; 35 U.S.C.A. § 69.[1] The District Court admitted the testimony on the defendant's assertion that it was directed to and was offered only to show the general state of the art at the time the plaintiff's patent was applied for and hence notice in accordance with the statute was not required under the rule of Brown v. Piper, 1875, 91 U.S. 37, 41, 23 L.Ed. 200. On cross-examination, however, the witness testified that he was not conversant with the knowledge and use of the plaintiff's method by the art generally, but that his testimony was based exclusively on his own mode of operation in his plant,

and furthermore that he had kept his mode of operation secret. Plaintiff's counsel, however, did not renew his objection after eliciting this testimony on cross-examination.

■ The established rule with respect to notice under the statute was stated years ago in Brown v. Piper, supra,[2] as follows:

"Evidence of the state of the art is admissible in actions at law under the general issue without a special notice, and in equity cases without any averment in the answer touching the subject. It consists of proof of what was old and in general use at the time of the alleged invention. It is received for three purposes, and none other,— to show what was then old, to distinguish what was new, and to aid the court in the construction of the patent."

■ Under this rule the District Court correctly admitted the testimony in the first instance on counsel's statement of the purpose for which it was offered, for in the light of that statement the court would naturally assume that when the witness was asked if he had "known or used" the method covered by Turini's patent years prior to the date thereof he was testifying as to what was old and generally known and used in the art and hence that the testimony tended to establish the background against which the patentee's contribution must be projected in order to decide the question of invention. But

1. The statute, insofar as it could be deemed material here, provides as follows:

"In any action for infringement the defendant may plead the general issue, and, having given notice in writing to the plaintiff or his attorney thirty days before, may prove on trial any one or more of the following special matters:

\* \* \* \* \*

"Fourth. That he [the patentee] was not the original and first inventor or discoverer of any material and substantial part of the thing patented; or,

"Fifth. That it had been in public use or on sale in this country for more than one year before his application for a patent, or had been abandoned to the public.

"And in notices as to proof of previous

invention, knowledge, or use of the thing patented, the defendant shall state \* \* \* the names and residences of the persons alleged to have invented or to have had the prior knowledge of the thing patented, and where and by whom it had been used \* \* \*. And the like defenses may be pleaded in any suit in equity for relief against an alleged infringement; and proofs of the same may be given upon like notice in the answer of the defendant, and with the like effect."

2. See also Dunbar v. Myers, 1876, 94 U.S. 187, 198, 199, 24 L.Ed. 34; Grier v. Wilt, 1887, 120 U.S. 412, 429, 7 S.Ct. 718, 30 L. Ed. 712; Johnson v. Lambert, 2d Cir., 1916, 234 F. 886, 889.

when it appeared on cross-examination that in fact the witness was testifying only as to his own personal knowledge and as to what he had himself used secretly, the situation changed radically for then it became apparent that the testimony, instead of relating to general knowledge and use, and hence bearing upon the question of invention, strictly speaking, instead bore on the question of novelty, as to which the statutory notice is clearly required. But counsel for the plaintiff did not renew his objection after his cross-examination with the result that no exclusionary ruling by the court was called for and hence none was made. Moreover, it is not clear that the District Court put any reliance on the testimony for that court did not consider the issue of novelty at all, on which the testimony was inadmissible under the statute, and, although there are perhaps indications to the contrary in the opinion below, it would seem from the colloquy between court and counsel at the time the admissibility of the testimony was ruled on that the court was fully aware of the rule of Brown v. Piper quoted above, and fully realized that the testimony, in view of the cross-examination, could not be used on the issue of invention, the only issue upon which that court decided the case.

■ We turn now to the apparatus patents. Patent No. 2,481,180, issued to Turini on the same day that his method patent was issued, September 6, 1949, is for a power press operated machine which automatically cuts rectangular segments from a ribbon of metal of suitable thickness for rollers, and after forming them into U-shape in cross section, attaches them as rollers to successive end bars of buckle frames as the latter are intermittently fed into the machine while still attached to one another side by side in a strip. The mechanism is a complicated one which in our view does not require detailed description. It will suffice to say that Patent No. 366,585 issued to Howe in 1887 discloses an automatic machine for forming and attaching rollers to separate buckle frames fed into it by gravity one by one, and that Turini merely made a

mechanic's adaptation of that machine to accommodate it to the strip feeding concept covered by his method patent and the patent to Russell. It seems to us after study and comparison that the corresponding elements of the Howe and Turini machines are very much the same except as to the feeding devices. Howe, as already indicated, fed individual buckles into his machine by gravity with a mechanical device not requiring description to interrupt the flow so that only one buckle at a time fell into the machine's working zone. Turini, on the other hand, fed his strip of buckles into his machine by pushing the strip along intermittently with a reciprocating finger-like device, an old and well known mechanical expedient for intermittent feeding. We see no invention in Turini's use of such a device as this, and we therefore conclude that the District Court was fully warranted in its conclusion that this machine of Turini's was not patentable over Howe.

■ Turini's other apparatus patent, No. 2,488,352, issued November 15, 1949, is for a power press operated device for cutting and forming tongues from a roll of suitable wire, and attaching them to the central cross bars of buckle frames fed into the machine in a continuous strip. It presents greater difficulty than his other apparatus patent.

In operation, a continuous strip of buckle frames is fed into the working zone of the machine covered by this patent by means of a mechanical finger similar to that used for the same purpose in the roller machine. The strip, however, instead of lying flat as it enters the machine, stands on edge and is kept in that position between two side plates. While the strip of frames is intermittently advanced by the mechanical finger in this manner, a continuous length of wire from which the tongues are to be formed is intermittently fed into the working zone at a right angle to the strip and at the approximate level of the cross bars. The wire, as it is advanced toward the working zone, is guided over a small rounded anvil and then onto a raised platform where it comes to rest with its leading end extend-

ing a slight distance over the edge of the platform and through a buckle frame just above the cross bar thereof. At this juncture a plunger which is attached to the hammer part of the press descends and clamps the wire in position on the platform. As the hammer part of the press descends even further, a cutting and bending plunger, also attached to the hammer, strikes the wire between the platform and the anvil causing the wire at this point to bend downward in the direction of the plunger's motion and then to divide. In this manner the piece of wire clamped onto the platform is severed from the length of wire, its severed end is slightly rounded over, and the new leading end of the wire is curled over the rounded anvil so that it may later, when the wire is advanced again, be more easily closed around the cross bar of the succeeding buckle frame.

While the clamping, bending and cutting operations just described are being performed, the other end of the tongue is curled around the buckle cross bar so as to encircle it completely. This is done by means of a horizontally moving die actuated by a cam attached to the hammer part of the press.

Thus it appears that on the down-stroke of the press a tongue is severed from the length of wire and attached to a buckle frame, and the next tongue is pre-formed for ready attachment to the succeeding buckle frame. On the up-stroke of the press the next buckle frame in the strip and the wire are advanced to their proper relative positions for attachment to one another.

It is clear that the patents and publications introduced in evidence to show the state of the art prior to Turini do not disclose any machine which can fairly be said to anticipate Turini's tongue making and attaching device. Nevertheless the court below found on adequate evidence, and it seems to us clear, that the various elements of his device, such as the anvil, platform, clamp, plunger, bending die, and so forth were all old and well known in the tool making art. No doubt Turini showed a fairly high degree of ingenuity in the way he formed these old elements and also in the way he arranged them to co-operate with one another to produce the result he sought and attained. But the court below found that what he did in forming and assembling the old and well known elements involved only "mechanical skill rather than invention even though it may be conceded that the functions performed by Turini are new and useful," and we agree.

Skills are notoriously high in the tool making art, as we had occasion to remark in 1946 in Brown & Sharpe Mfg. Co. v. Kar Engineering Co., Inc., 1 Cir., 154 F.2d 48, certiorari denied 328 U.S. 869, 66 S.Ct. 1377, 90 L.Ed. 1640, and in that art the adaptation and rearrangement of old elements to perform new functions is all in the day's work.

It is incumbent upon us then to scrutinize the patent under consideration carefully to see if some uncommon skill above and beyond the high level of skill ordinarily found in the tool making art was required either in conceiving the patented device, or after conceiving it, in organizing the old elements in such a way as to translate the conception into a functioning machine. Our analysis of the machine leads us to the same conclusion reached by the court below. Clever and ingenious the device may be, and it no doubt speeded production, but nevertheless viewed against the background of the high level of skill ordinary and usual in the tool making art, we do not think it can be regarded, either in its conception or construction, as a sufficiently outstanding contribution to the sum of useful knowledge to warrant the protection of a patent.

The judgment of the District Court is affirmed.